1  Mara E. Rosales (SBN: 104844)
   mrosales@meyersnave.com
2  Joseph M. Quinn (SBN: 171898)
   jquinn@meyersnave.com
3  MEYERS, NAVE, RIBACK, SILVER & WILSON
   575 Market Street, Suite 2600
4  San Francisco, California 94105
   Telephone: (415) 421-3711
5  Facsimile: (415) 421-3767

6  Attorneys for Defendants
   CITY OF OAKLAND and
7  PORT OF OAKLAND

8  David L. Alexander, Port Attorney (SBN: 59069)
   dalexand@portoakland.com
9  Danny Wei Wan, Deputy Port Attorney (SBN: 168323)
   dwan@portoakland.com
10 PORT OF OAKLAND
   530 Water Street
11 Oakland, California 94607
   Telephone: (510) 627-1136
12 Facsimile: (510) 444-2096

13 Attorneys for Defendant
   PORT OF OAKLAND

14

15

16

                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

17 AMERICAN CIVIL RIGHTS                   CASE NO. CV 07-6058 (JCS)
   FOUNDATION, a non-profit, public benefit
   corporation,                           MEMORANDUM OF POINTS AND
18                                         AUTHORITIES IN SUPPORT OF
                                           MOTION TO DISMISS (FRCP 12(b)(6))
19            Plaintiff,

20        v.                               Date:       January 18, 2008
                                           Time:       9:30 a.m.
21 CITY OF OAKLAND, CALIFORNIA, a          Courtroom:  A
   political subdivision of the State of California   Judge:      Hon. Joseph C. Spero
22 and the PORT OF OAKLAND, a public
   entity,

23            Defendants.

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

II.   STATEMENT OF FACTS ..................................................................................... 2

    A.   Relevant Facts Regarding the Port and the City ........................................ 2

        1.   The Port of Oakland Generally ...................................................... 2

        2.   The Port and City Budgets ............................................................. 2

        3.   The Port's Funding and Operations ............................................... 3

    B.   Apposite Federal Statutory and Regulatory Mandates ............................. 4

    C.   The Port's Federally Mandated ACDBE Program ................................... 6

    D.   ACRF's Allegations and Claim ............................................................... 7

III.   ARGUMENT ...................................................................................................... 8

    A.   The City Is Not a Proper Party ................................................................. 8

    B.   ACRF's Proposition 209 Claim Does Not Meet Article III's Justiciability Requirements ...................................................................... 9

        1.   ACRF Cannot Establish Standing on the Grounds of a Taxpayer's Suit in Federal Court ................................................ 9

        2.   ACRF Cannot Establish Associational Standing so as to Satisfy the Injury in Fact Requisite of Article III ............................ 11

            a.   Nothing in ACRF's Complaint Evidences the Requisite Standing of Its Individual Members ..................... 11

            b.   Protection of Concessionaire Rights is Not Germane to ACRF's Purpose ................................................................ 12

        3.   ACRF' Suit is Not Ripe for Adjudication ..................................... 13

        4.   As a Matter of Law, Plaintiff is Not Entitled to Injunctive or Declaratory Relief ....................................................................... 14

    C.   ACRF's Facial Challenge Is Barred by the One-Year Statute of Limitations ........ 15

    D.   ACRF's State-Law Claim under Proposition 209 Is Preempted by Federal Law ............................................................................................. 16

IV.   CONCLUSION .................................................................................................. 18

1

# TABLE OF AUTHORITIES

2

Page

3  CASES

4  Abbott Laboratories v. Gardner,
      387 U.S. 136 (1967) ................................................................................................ 13

5
   Associated General Contractors of California v. Coalition for Economic Equity,
6      950 F.2d 1401 (9th Cir. 1991)................................................................................ 12

7  Bras v. California Public Utilities Com'n,
      59 F.3d 869 (9th Cir.1995)...................................................................................... 15

8
   Califano v Sanders,
9      430 U.S. 99 (1977) .................................................................................................. 13

10 Cammack, v. Waihee,
      932 F.2d 765 (9th Cir. 1991) .................................................................................. 11

11
   Caribbean Marine Servs. Co. v. Baldridge,
12     844 F.2d 668 (9th Cir. 1988)................................................................................... 15

13 City of Oakland v. Williams,
      206 Cal. 315 (1929)................................................................................................... 8

14
   Clinton v. Acequia, Inc.,
15     94 F.3d 568 (9th Cir. 1996)..................................................................................... 13

16 Coral Construction, Inc. v. City and County of San Francisco, et al.,
      116 Cal.App.4th 6 (2004) ....................................................................................... 15

17
   Crosby v. National Foreign Trade Council,
18     530 U.S. 363 (2000) ................................................................................................ 16

19 English v. Gen. Elec. Co.,
      496 U.S. 72 (1990) .................................................................................................. 16

20
   Exxon Corp. v. Heinze,
21     32 F.3d 1399 (9th Cir. 1994).................................................................................. 13

22 Foods Co., Inc. v. RJR Holdings, Inc.,
      252 F.3d 1102 (9th Cir. 2001)................................................................................ 17

23
   Gade v. Nat'l Solid Wastes Management Ass'n,
24     505 U.S. 88 (1992) .................................................................................................. 16

25 Geier v. Am. Honda Motor Co., Inc.,
      529 U.S. 861 (2000) ................................................................................................ 16

26
   Haggerty v. City of Oakland,
27     161 Cal.App.2d 407 (1958) ...................................................................................... 9

28

ii

Hangarter v. Provident Life & Acc. Ins. Co.
  373 F.3d 998 (9th Cir. 2004) .................................................................................................. 9

Hines v. Davidowitz,
  312 U.S. 52 (1941) ................................................................................................................ 16

Hoohuli v. Ariyoshi,
  741 F.2d 1169 (9th Cir. 1984).............................................................................................. 11

Humane Soc. of U.S v. State Bd. of Equalization,
  152 Cal.App.4th 349 (2007)................................................................................................. 10

Hunt v. Washington Apple Advertising Comm'n,
  432 U.S. 333 (1977) .........................................................................................................11-13

Lee v. State of Oregon
  107 F.3d 1382 (9th Cir. 1997)............................................................................................... 13

Los Angeles Memorial Coliseum Comm'n v. National Football League,
  634 F.2d 1197 (9th Cir.1980)................................................................................................ 15

Lujan v. Defenders of Wildlife,
  504 U.S. 555 (1992) ......................................................................................................... 9, 14

Morales v. Trans World Airlines, Inc.,
  504 U.S. 374 (1992) .............................................................................................................. 17

National Park Hospitality Ass'n v. Department of Interior
  538 U.S. 803 (2003) .............................................................................................................. 13

Sprietsma v. Mercury Marine
  537 U.S. 51(2002) ................................................................................................................. 17

Texas v. United States,
  523 U.S. 296 (1998) ......................................................................................................... 10, 14

Thomas v. Union Carbide Agricultural Prod. Co.,
  473 U.S. 568 (1985) .............................................................................................................. 13

Transdyn v. City and County of San Francisco,
  72 Cal.App.4th 746 (1999).................................................................................................... 15

William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,
  526 F.2d 86 (9th Cir. 1975)................................................................................................... 15

**CONSTITUTIONS**

U.S. Const.

  art. III............................................................................................................................Passim

  art. VI ................................................................................................................................... 16

Cal. Const.

art. I, § 31 ................................................................................................ 1, 8

art. XI, § 5(a) .............................................................................................. 2

**STATUTES**

Cal. Bus. & Prof. Code § 17200 ..................................................................... 9

Cal. Civ. Proc. Code § 526a ......................................................................... 10

Cal. Gov. Code, § 53701 ................................................................................ 2

49 U.S.C.

§ 47107 ................................................................................................ 4, 17-18

§47113 .................................................................................................... 4, 17

**REGULATIONS**

49 C.F.R. Part 23 ................................................................................... Passim

**OTHER AUTHORITIES**

Oakland City Charter § 716. .......................................................................... 3

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

The American Civil Rights Foundation ("ACRF") asks this Court to invalidate the federally-mandated Airport Concession Disadvantaged Business Enterprise Program ("ACDBE Program") at the Oakland International Airport because ACRF claims that the ACDBE Program conflicts with California Constitution Article I, Section 31, otherwise known as Proposition 209. ACRF alleges that the ACDBE Program, though approved by the US Department of Transportation ("USDOT") pursuant to its regulations, is unconstitutional because it may permit race-conscious criteria to be considered in the selection of Airport concessionaires and the Program does not comply with requirements of federal laws and regulations. As defendants, ACRF names the City of Oakland and the Port of Oakland.   But ACRF fails to state a viable claim against either defendant.

As to the City of Oakland, ACRF's claim fails because the City is not involved in enacting or enforcing the ACDBE Program.   The Port is an independent department of the City with sole and exclusive responsibility for the ACDBE Program. Accordingly, the City should be dismissed from this action.

As to the City *and* the Port, ACRF's claim is non-justiciable, untimely and, in any event, federal law preempts application of Proposition 209 to invalidate the ACDBE Program.  As to Article III justiciability, ACRF fails to plead that any of ACRF's members are concessionaires who have been subject to the Port's ACDBE Program or that would-be concessionaires among its membership have suffered an "injury in fact" due to the ACDBE Program.  Nor has ACRF demonstrated that its claim is ripe.  ACRF has not pled that the Port has actually applied the objected-to race-conscious provision of the ACDBE Program or enforced its requirements against any party. Nor has ACRF pled any threat of imminent harm so that injunctive and declaratory relief may be appropriate. This is all the more so in that the ACDBE Program and the USDOT approval of the Program is set to expire prior to the hearing on this Motion, so that Plaintiff's request for injunctive relief will be rendered moot.

Second, ACRF's facial challenge is stale.  A one-year statute of limitations governs facially constitutional challenges and ACRF did not timely file its challenge.  For all of these reasons,

1

1   Defendants maintain that ACRF fails to state a claim upon which relief can be given, so that the

2   court should dismiss this Action.

3          Finally, ACRF's claim fails on the merits because federal law preempts operation of

4   Proposition 209 against federally required airport concessions programs, like the Airport's

5   ACDBE Program.

## II. STATEMENT OF FACTS

**A.    Relevant Facts Regarding the Port and the City**

**1.    The Port of Oakland Generally**

9          The City of Oakland is a charter city. (RJN, Exh. 1, Charter of the City, Ordaining

10  Clause.) Charter cities may create and regulate a sub-government within the city. (Cal. Const. art.

11  XI, § 5(a).) Accordingly, City created the Port as an independent, and self-supporting City

12  department. (RJN, Exh. 2, Charter of the City, Article VII.)

13         The Board of Port Commissioners ("Board") is the legislative body under the City Charter

14  and has "exclusive control and management of the Port Department." The Board is made up of

15  individuals nominated by the mayor and confirmed by the city council for a term of four years.

16  (RJN, Exh. 2, Charter of the City, Section 701.) Board members serve independently and may be

17  removed only for cause and upon an affirmative vote of a super majority of the council. (RJN,

18  Exh. 2, Charter of the City of Oakland, §§ 703 and 601.) In general the Board is "to have and

19  exercise on behalf of the City all rights, powers and duties" in respect to the Port. (Id. at 706(17).)

20  As a legislative body, the Port "may accept grants or loans of funds made available by the Federal

21  Government or a federal department or agency to aid in financing plans for, or construction of,

22  public works." (See Cal. Gov. Code, § 53701.) In turn, the Port exercises exclusive control and

23  management of the Airport under the Charter. (RJN, Exh. 2, § 717(1).)

**2.    The Port and City Budgets**

25         On information and belief, the Complaint alleges that "the City receives and benefits from

26  state and local tax monies, which are used, in part, to support and finance the ACDBE Program."

27  (Complaint,¶ 3.) This statement is false.

28  / / /

2

1       As an independent department with the power and duty to establish its own budget under
2   the City Charter, the Port is required to "annually…carefully prepare a budget setting forth the
3   estimated receipts of the Port, and revenue from other sources, for the ensuing year, and the sums
4   of money necessarily required for the administration of the department, and for maintenance,
5   operation, construction, and development of the port and its facilities for the ensuing year, and
6   stating the amount necessary to be raised by tax levy for said purposes." (RJN, Exh. 2, § 715.)
7   Pursuant to Charter Section 716, the Port may "request or provide for the allocation or
8   appropriation to the Port by the [City] Council of any funds raised or to be raised by tax levy or in
9   any manner to be obtained from general revenues of the city."

10       A statement of the Port's revenues, expenses, and changes in net assets is contained in the
11   "Budget Summary" for each of the identified fiscal years. (RJN, Exhs. 3, FY '05/'06 Port Budget
12   Summary, A-17; 4, FY '06/'07 Port Budget Summary, A-23; 5, FY '07/'08 Port Budget Summary,
13   B.7 to B.8.) No monies from tax revenues or the City are listed in these statements. (Id.)

14       Separate and independent of the Port's budget, the City's total annual balanced budget for
15   FY 2005/2006 was $941,496,973; for FY 2006/2007 it was $1,0461,641; and for FY 2007/2008 it
16   is $1,066,031,119. (RJN, Exhs. 6, City of Oakland, FY 2005/2007 "Budget in Brief" Summary, D-
17   18; 7, FY 2007/2009 City of Oakland, Adopted Budget, D-14.) Property tax is the City's largest
18   source of revenue in each of the identified fiscal years. (RJN, Exhs. 6, City of Oakland, FY
19   2005/2007 "Budget in Brief" Summary, D-26; 7, FY 2007/2009 City of Oakland Adopted Budget,
20   D-18 to D-19.)

21       A summary of each fiscal year's expenditures lists the City funds and programs to receive
22   monies from each funding source. (RJN, Exhs. 6, 2005/2007 City of Oakland Adopted Budget,
23   D-46 to 47; 7, FY 2007/2009 City of Oakland Adopted Budget, D-36 to 39.) The Port is not listed
24   for any of the identified fiscal years. (Id.)

25   **3.    The Port's Funding and Operations**

26       The Port of Oakland operates the Airport, which is financially supported by operating
27   revenues. The Port has no taxing powers and receives no tax funds from the City of Oakland.
28   Under the Oakland City Charter, the Port is governed independently from the City by the Board of

3

1  Port Commissioners, which has the exclusive control and management of the Port.

2       The Port receives federal grant funding from the USDOT and the Federal Aviation

3  Administration ("FAA") for airport improvements. (RJN, Exhibits 12-14.) To receive such

4  federal grant funds, USDOT requires the Port, among other grant conditions, to adopt a program

5  to assure non-discrimination by airport concession contractors. (49 CFR Part 23.) The regulation

6  also requires the Port to adopt, race- and gender-based contracting conditions in the award of its

7  airport concession agreements under specified conditions.

8  **B.    Apposite Federal Statutory and Regulatory Mandates**

9       Congress has established a public policy to provide airport business opportunities for small

10 businesses owned and controlled by socially and economically disadvantaged individuals ("federal

11 affirmative action requirements").[1] The USDOT and the FAA, through the Airport Improvement

12 Program ("AIP") distribute substantial funds to finance construction projects initiated by state and

13 local governments who own, control and manage airports. (RJN, Exh. 8, Chapters 1 and 2.) To

14 receive federal funding for airport development or authorized projects, an airport must sign grant

15 assurances that it will comply with applicable federal laws, including federal affirmative action

16 requirements. (RJN, Exhs. 8, Chapter 2; 12 to 14.) The USDOT/FAA ensure that airports and

17 their governing bodies comply with federal law through the grant funding agreement process and

18 the FAA's Order 5190.6A, Airport Compliance Requirements. (RJN, Exh. 8.)

19      In 2005, the USDOT adopted and implemented revised regulations governing airport

20 concession disadvantaged business enterprise ("ACDBE") participation in airport concessions.

21 These regulations are codified as 49 CFR Part 23 entitled "Participation by Disadvantaged

22

23 [1] Specifically, pursuant to 49 U.S.C. § 47107(e)(l), Congress provides that "[t]he Secretary of

24 Transportation may approve a project grant application...for an airport development project only if
   the Secretary of Transportation receives written assurances, satisfactory to the Secretary, that the

25 airport owner or operator will take necessary action to ensure, to the maximum extent practicable,
   that at least 10 percent of all businesses at the airport selling consumer products or providing

26 consumer services to the public are small business concerns (as defined by regulations of the

27 Secretary) owned and controlled by a socially and economically disadvantaged individual (as
   defined in Section 47113(a) of this title)...."

28

MPA ISO Motion to Dismiss (FRCP 12(b)(6))
[CV 07 6058-(JCS)]

1  Business Enterprises in Airport Concessions" ("ACDBE Regulations" or "Regulations"). (RJN,

2  Exh. 10.) The objectives of Part 23 are:

- To ensure nondiscrimination in the award and administration of opportunities for concessions by airports receiving USDOT financial assistance;

- To create a level playing field on which ACDBEs can compete fairly for opportunities for concessions;

- To ensure that the USDOT's ACDBE program is narrowly tailored in accordance with applicable law;

- To ensure that only firms that fully meet this part's eligibility standards are permitted to participate as ACDBEs;

- To help remove barriers to the participation of ACDBEs in opportunities for concessions at airports receiving USDOT financial assistance; and

- To provide appropriate flexibility to airports in establishing and providing opportunities for ACDBEs.

14  (RJN, Exh. 10, § 23.1)  The ACDBE Regulations require airport grant recipients ("airport

15  sponsors") to draft and adopt ACDBE programs and submit them to the FAA for approval. (Id., §

16  23.21.)  The Regulations specify measures that grant recipient airports must include in their

17  ACDBE programs to ensure nondiscrimination, including setting goals for ACDBE participation

18  in airport concession opportunities through the use of both race-neutral and race-conscious

19  measures. (Id., § 23.25)  The Regulations specify the formula for calculating goals, both race-

20  neutral and race-conscious. (Id., §§ 23.45; 23.51.)  USDOT also prepared a sample template for

21  airport grant recipients to follow in drafting and adopting their specific programs. (RJN, Exh. 9.)

22  As stated on the face of that template, "[t]he General Counsel of the Department of Transportation

23  has reviewed this sample program and approved it as consistent with the language and intent of 49

24  CFR Part 23." (Ibid.)

25          The ACDBE Regulations require that ACDBE goals be set for all airport concessions

26  awarded. (RJN, Exh. 10, § 23.41(a).)  The USDOT regulations specify how an airport expresses,

27  calculates and sets ACDBE participation goals based on the availability of ACDBE's in each of

28  the Airport's concessions markets. (Id., § 23.51.)  The Regulations instruct airports to provide the

5

1   FAA with the "data, calculations, assumptions, and reasoning in establishing your goals." (Id., §

2   23.45 (e).)  The Port complied with these requirements.  (See Complaint, Exh. 2 at 3-9 and also

3   ¶16.)

4       In implementing its ACDBE program, the airport sponsor must first exhaust race neutral

5   measures to achieve its ACDBE goals. (RJN, Exh. 10, § 23.25(d).)  Airport sponsors must also

6   provide for "race-conscious" measures when race-neutral measures, standing alone, are not

7   projected to be sufficient to meet the overall goals.  (RJN, Exh. 10, § 23.25(e).)

8       The USDOT states that "[i]mplementation of the ACDBE program is accorded the same

9   priority as compliance with all other legal obligations incurred by [the airport sponsor] in its

10  financial assistance agreements with the [USDOT]." (RJN, Exh. 9 at 2.)  Failure to uphold any of

11  those legal obligations subjects an airport to loss of federal funding.  (RJN, Exh. 10, § 23.11 read

12  in conjunction with Exh. 11, 49 CFR Part 26, § 26.101 ["If you fail to comply with any

13  requirement of this part [23 or 26], you may be subject to formal enforcement action . . ., such as

14  the suspension or termination of Federal funds, or refusal to approve projects, grants or contracts

15  until deficiencies are remedied."].)

16  **C.    The Port's Federally Mandated ACDBE Program**

17      On several occasions, the Port has applied for and has been granted AIP funding for airport

18  improvements. (RJN, Exhs. 12 to 14.)  A term in the grant agreements is that the Port "will

19  comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and

20  requirements as they relate to the application, acceptance and use of Federal funds for this project

21  including but not limited to...49 CFR Part 23 – Participation by Disadvantage Business Enterprise

22  in Airport Concessions." (See, e.g., RJN, Exh. 12, July 21, 2005 DOT/FAA grant agreement at 5,

23  ¶ 17 and Assurance C. "Sponsor Certification" at 1-3.)  The Port's Board approved submission of

24  the Program to the FAA for FAA approval. (RJN, Exh. 15.)  In preparing its ACDBE Program that

25  is now before this Court, the Port followed the specific mandates, methodologies and formulas of

26  the ACDBE Regulations. (See RJN, Exh. 10 and compare with Complaint, Exh. l.)

27      Federal regulations specify the terms and requirements of ACDBE programs.  49 CFR

28  Sections 23.1 and 23.23 set forth the objectives of an ACDBE program and the policy underlying

6

1    it. (RJN Exh. 10.) The Port's ACDBE Program sets forth these policies in the Program's policy

2    section. (Complaint, Exh. 1 at 4.) Part 23 defines the terms "socially and economically

3    disadvantaged individual", "concessions" and "race conscious." (RJN, Exh. 10, § 23.3.) The

4    Port's ACDBE participation goals are also calculated and established pursuant to the federal

5    ACDBE Regulations. (RJN, Exh. 10, § 23.51.) The Regulations do not require an airport's goals

6    to be supported by a disparity study. (Id., § 23.51(c).

7         In following the ACDBE Regulations, the Port's ACDBE Program, as part of its overall

8    multi-year goal, established an 18.7% ACDBE participation goal. (Complaint, Exh. 2 at 1.)

9    Consistent with the ACDBE Regulations, the Port intends to meet its goal through race-neutral

10   means. Only if such means are inadequate does the Port consider race-conscious means to

11   augment ACDBE participation on a contract by contract basis. (Complaint, Exh. 1 at 13-14; Exh.

12   2 at 7-8.)

13        The FAA approved the Port's 2006-2008 ACDBE Program and its overall goal on March

14   24, 2006. (RJN, Exh. 16.) Pursuant to the directive of the FAA, the race-conscious components of

15   the Program terminate on January 1, 2008. (RJN, Exh. 16.)

16   **D.    ACRF's Allegations and Claim**

17        ACRF's Complaint alleges as follows:

18        1. At least one of its members has paid California income tax and real property taxes and

19   assessments on property located within the City, within the last year (Complaint, ¶ 2);

20        2. The City and Port receive and benefit from state and local monies (¶¶ 3-4). These state

21   and local monies are then used for Port operations, including the Airport, in part to support and

22   finance the ACDBE Program and in part to implement and administer the ACDBE Program (¶¶ 2-

23   4); and

24        3. The City and Port have a "duty to enforce the California Constitution by not engaging

25   in discrimination or granting preferential treatment on the basis of race, sex, color, ethnicity, or

26   national origin in the operation of public contracting" pursuant to Prop. 209. (¶¶ 3-4.)

27        ACRF also makes several conclusory allegations regarding the ACDBE Program. ACRF

28   contends that the Program grants preferential treatment to individuals and groups on the basis of

7

1  race, sex, color, ethnicity, or national origin and that this Program constitutes a violation of

2  Section 31. (¶ 10.)  ACRF also states that Defendants will continue to illegally expend monies in

3  enforcing, implementing and administering the ACDBE Program. (¶ 26.)  ACRF further alleges

4  that this Program encourages prime contractors to discriminate. (¶ 24.)  ACRF believes that, as

5  designed, implemented and enforced, the Program results in unequal and disadvantageous

6  treatment in the competition for concession contracts. (*Id.*)

7      ACRF states only one cause of action for violation of article I, Section 31 of the California

8  Constitution. (¶¶ 23-26.)  ACRF filed its Complaint in state court.  In response to Defendants'

9  demurrer to the Complaint, Plaintiff, for the first time, raised certain federal questions in

10  opposition to the demurrer.  As a result, Defendants timely removed the case to federal court and

11  filed the instant Motion.

12              **III.    ARGUMENT**

13      ACRF's facial challenge fails because ACRF has not met the Article III justiciability

14  requirements, ACRF's claim is untimely, and ACRF's claim is premised on application of

15  preempted state law.

16  **A.    The City Is Not a Proper Party**

17      The City has no responsibility over the Airport or its federally mandated ACDBE Program.

18  The Port is a self-supporting independent department of the City and governs its own internal and

19  operational affairs separate from the City. (RJN, Ex. 2, Charter of the City of Oakland, Article

20  VII.)  ACRF thus has incorrectly named the City as a defendant.

21      In City of Oakland v. Williams, 206 Cal. 315, 320 (1929), the Court interpreted the powers

22  of the Port.  In that case, a petition for writ of mandamus was brought to compel the City auditor

23  to certify that funds were available to pay a contractor of the Port.  The Court stated that the City

24  Charter "provides for the creation of a board of port commissioners, consisting of five [now

25  seven] members vested with the exclusive control and charge of said harbor, as the successor of all

26  rights and powers formerly exercised by said city, and it is charged with the performance of all the

27  duties formerly imposed upon said city, and is given such legislative and administrative powers as

28  were deemed necessary to enable it 'to promote and more definitely insure the comprehensive and

8

1    adequate development of the Port of Oakland through continuity of control, management and

2    operation'." (RJN, Ex. 2, Charter of the City of Oakland, Section 701 and 706.)

3    　　　The California Court of Appeals later elaborated on the exclusive nature of the Port

4    Commissioners' power over Port operations and Port lands. In Haggerty v. City of Oakland, 161

5    Cal.App.2d 407 (1958), the Court ruled that the Board of Port Commissioners has the direct

6    power, exclusive of the powers of the City Council, to construct and lease a convention hall in the

7    Port area. In so deciding, the Court held that the "'Port Department' is not only *a* legislative body

8    of the municipality of Oakland , but it is *the* body given exclusive control over port matters". Id.

9    at 414; emphasis added.

10    　　　Given that the Port is an independent department of the City with sole and exclusive

11    responsibility for the ACDBE Program, the City should be dismissed from the action.

12    **B.    ACRF's Proposition 209 Claim Does Not Meet Article III's Justiciability**

13    **　　　Requirements**

14    　　　As to the City and the Port, ACRF's claim fails under three of the four principles of

15    justiciability. ACRF lacks standing and, at once, presents a claim that is both unripe and moot.

16    　　　**1.    ACRF Cannot Establish Standing on the Grounds of a Taxpayer's Suit in**

17    　　　　　**Federal Court**

18    　　　· Standing is an essential and immutable part of the case-or-controversy requirement of

19    Article III suits. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). To establish

20    standing, plaintiff must have an "injury in fact" that involves "an invasion of a legally-protected

21    interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or

22    hypothetical." Id. at 559-560, 112 S.Ct. at 2136. An interest shared generally with the public at

23    large will not confer constitutional standing. See Hangarter v. Provident Life & Acc. Ins. Co., 373

24    F.3d 998 (9th Cir. 2004), 1021-1022 [federal standing requirements apply even to action under

25    state law (Calif. Bus. & Prof. C., § 17200) that allows suit on behalf of general public.] Rather, by

26    "particularized," the courts mean that the injury must affect the plaintiff in a personal and

27    individual way. Lujan, 504 U.S. at 560, n.1. In that ACRF's membership has suffered no

28    particularized harm, ACRF, in turn, has no basis upon which to invoke standing on their behalf.

MPA ISO Motion to Dismiss (FRCP 12(b)(6))
[CV 07 6058-(JCS)]

1    Further, it is well established that a claim is "too speculative" where the proposed harm depends

2    on the occurrence of "contingent future events that may not occur as anticipated, or indeed may

3    not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998). Such is the case at bar.

4            In an attempt to establish standing in this lawsuit on behalf of itself and its individual

5    members, ACRF alleges that at least one of its members resides and pays taxes in the City of

6    Oakland and that at least one of its members has paid state income taxes and real property taxes on

7    property in Oakland within the past year. (Complaint, ¶ 2.) On information and belief, ACRF

8    also alleges that such taxes, in part, support the Port of Oakland's operations, including the Airport

9    and the "implementation and administration of the ACDBE Program." Absent immediate threat

10   of harm or any proof that the taxpayer's money funded the ACDBE Program, ACRF's taxpayer

11   allegations fail to demonstrate standing for ACRF or its members.

12           In California, a taxpayer suit may be brought to redress an illegal or wasteful expenditure

13   of public funds or damage to public property, so long as the action involves an actual or threatened

14   expenditure of public funds. See Cal. Civ. Proc. Code § 526a; Humane Soc. of U.S v. State Bd. of

15   Equalization, 152 Cal.App.4th 349, 361 (2007). Such suit, however, is not generally appropriate

16   for primarily political issues or issues implicating the exercise of discretion of either the legislative

17   or executive branches of government. Humane Soc. of U.S., 152 Cal.App.4th at 356; 61 Cal.

18   Rptr. 3d at 281. Moreover, although ACRF alleges that the City and the Port continue to spend

19   local and state monies to implement and administer the ACDBE Program (Complaint, ¶¶ 3-4),

20   such assertions are baseless. The documents judicially noticed herein clearly establish there were

21   no expenditures or threatened expenditures of public tax funds by the Port for any purpose,

22   including the adoption and implementation of the ACDBE Program.

23           In particular, the City's budgetary documents indisputably show that the City has not

24   provided *any* tax money to the Port in the fiscal years at issue. (RJN, Exhs. 6 & 7.) Simply stated,

25   the Port receives *no* tax monies from the City. (RJN, Exhs. 3 & 4.) Similarly, no tax money is

26   spent on implementing the ACDBE Program at issue. Hence, there is no "actual or threatened

27   expenditure of public funds" that could confer standing upon Plaintiff even in state court.

28   / / /

MPA ISO Motion to Dismiss (FRCP 12(b)(6))
[CV 07 6058-(JCS)]

1    More fundamentally, in federal court, the absence of an injury in fact to an individual

2   taxpayer will defeat any claim of standing.  In this regard, there has to be something more than a

3   tangential relationship between the taxes paid and the policy being contested for standing to lie.

4   Thus to establish standing in a state or municipal taxpayer suit under Article III, the plaintiff must

5   "set forth the relationship between taxpayer, taxpayer dollars, and the allegedly illegal government

6   activity."  Hoohuli v. Ariyoshi, 741 F.2d 1169, 1178 (9th Cir. 1984); see also Cammack, v.

7   Waihee, 932 F.2d 765, 770 (9th Cir. 1991) (holding that the "requirement of a pocketbook injury

8   applies to municipal taxpayer standing as well as to state taxpayer standing.)  As discussed further

9   below, none of the members of ACRF could have sued in their own right for want of

10  particularized harm.  Absent an injury in fact, plaintiff is also barred from maintaining a viable

11  taxpayer suit and cannot satisfy the threshold for Article III standing.

12         **2.    ACRF Cannot Establish Associational Standing so as to Satisfy the Injury in
               Fact Requisite of Article III**
13

14    While an organization may sometimes sue on behalf of its members to establish requisite

15  standing under Article III, no such representational standing obtains unless the association satisfies

16  a three-prong test established by the Supreme Court in Hunt v. Washington Apple Advertising

17  Comm'n, 432 U.S. 333 (1977).  The organization must show that "(a) its members would

18  otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane

19  to the organization's purpose; and (c) neither the claim asserted or the relief requested requires the

20  participation of individual members in the lawsuit."  Id. at 343.  The face of ACRF's Complaint

21  demonstrates that it cannot meet the first two prongs of the Hunt criteria for associational

22  standing.

23         **a.    Nothing in ACRF's Complaint Evidences the Requisite Standing of Its
               Individual Members**
24

25    Just as ACRF fails to establish a case or controversy based on alleged taxpayer standing,

26  so it fails to demonstrate any nexus between the ACDBE Program and potential, let alone actual,

27  harm to plaintiff's membership singly or collectively.  Nowhere in ACRF's Complaint does

28  plaintiff allege that a single member of its organization has been personally affected, economically

MPA ISO Motion to Dismiss (FRCP 12(b)(6))
[CV 07 6058-(JCS)]

1   impacted or somehow dissuaded from applying for concessionaire work at the Airport. Indeed the
2   Complaint is loudly silent on this issue. Such an omission can hardly be accidental. ACRF is a
3   nonprofit public benefit corporation whose mission is monitoring and enforcing civil rights laws.
4   (Complaint, ¶ 2.) Nowhere does the Complaint allege that its members are would-be
5   concessionaires at the Airport or elsewhere. Plaintiff's silence on this critical fact is a tacit
6   omission that the organization's individual members could not in their own right prove an injury
7   in fact from potential application of the ACDBE Program, so as to satisfy the case or controversy
8   requirement of Article III. If its membership lacks standing, by extension, ACRF lacks standing
9   to sue on their behalf. Associational standing is purely derivative and cannot exist in the absence
10  of standing on the part of the members whose interests an organization represents. Accordingly,
11  ACRF cannot meet the first prong of the <u>Hunt</u> test for establishing standing.

12          **b.    Protection of Concessionaire Rights is Not Germane to ACRF's**
                    **Purpose**
13

14          Plaintiff nowhere alleges, and Defendants know of no case law which supports the
15  proposition, that an organization can obtain surrogate standing on behalf of a membership where
16  the interest sought to be protected is only tangentially related to the organization's purpose. As
17  discussed above, ACRF does not have a roster of concessionaires among its members, protection
18  of whose interests advances plaintiff's mission. Unlike cases where the second prong of the <u>Hunt</u>
19  test is met because the organization at issue represents individuals whose particular interests are
20  advanced by the actions of the organization, nothing in the Complaint claims a particularized role
21  for ACRF in advancing concessionaire opportunities or protecting the rights of concessionaires.

22          By contrast, the courts have found associational standing where a challenged minority set
23  aside program does directly implicate the interests of an organization's membership. Such was the
24  case in <u>Associated General Contractors of California v. Coalition for Economic Equity</u>, 950 F.2d
25  1401 (9th Cir. 1991) where the court found associational standing under the <u>Hunt</u> test. There,
26  AGCC challenged a public entity's use of racial and gender preferences to remedy discrimination
27  in city contracting. In finding that AGCC met the second prong of <u>Hunt</u>, the court noted that the
28  express interest of AGCC in preserving favorable bidding conditions for its members was "clearly

12

1  germane to the organization's purpose." Id. at 1406. This purpose was explicitly stated in

2  AGCC's complaint which stated that "AGCC exists for the purpose, among others, of fostering,

3  promoting, and protecting the common interests of its member contractors and subcontractors in

4  the construction industry in California." Although the court went on to deny AGCC the injunctive

5  relief it sought, it was not for want of standing. By contrast here, nothing in Plaintiff's Complaint

6  demonstrates that its organizational goals are to protect rights particular to its membership with

7  respect to concession-related contract work. Thus, ACRF fails to satisfy the second prong of the

8  Hunt test for representational standing.

9           **3.    ACRF' Suit is Not Ripe for Adjudication**

10          The ripeness doctrine prevents premature adjudication or a court's rendering of purely

11  advisory opinions in cases that lack a concrete impact upon the parties. Thomas v. Union Carbide

12  Agricultural Prod. Co., 473 U.S. 568, 580 (1985); Exxon Corp. v. Heinze, 32 F.3d 1399, 1404 (9th

13  Cir. 1994). Whereas standing pertains primarily to whether a party may properly litigate, which

14  Defendants here maintain Plaintiff may not, ripeness addresses *when* that litigation may occur.

15  Lee v. State of Oregon,107 F.3d 1382, 1387 (9th Cir. 1997) The ripeness doctrine derives both

16  from Article III limitations on judicial power and from prudential reasons for refusing to exercise

17  jurisdiction. National Park Hospitality Ass'n v. Department of Interior  538 U.S. 803, 808 (2003).

18          More particularly, the ripeness issue addresses two factors: the fitness of the issues for

19  judicial determination and the hardship to the parties of withholding court consideration. With

20  respect to the former, the courts hold that a case "is not ripe where the existence of the dispute

21  itself hangs on *future* contingencies that may not occur" (emphasis provided.) Clinton v.

22  Acequia, Inc., 94 F.3d 568, 572 (9th Cir. 1996). With respect to the latter, the question is whether

23  the parties would suffer any hardship by postponing judicial action. Abbott Laboratories v.

24  Gardner, 387 U.S. 136, 149 (1967) (overruled on other grounds in Califano v Sanders, 430 U.S. 99

25  (1977)).

26          Here, the scope of the controversy is purely conjectural in that no concrete action has been

27  taken that even tangentially impacts Plaintiff or its membership. Moreover, Plaintiff points to no

28  application of the race conscious criteria of which it complains to anyone, whether or not a

MPA ISO Motion to Dismiss (FRCP 12(b)(6))
[CV 07 6058-(JCS)]

1  member of its organization. Rather, ACRF substitutes conjecture for facts to support its baseless

2  assertions, made on information and belief, that race conscious measures have been actually used

3  in determining concession contracts. (See, e.g., Complaint, ¶¶ 16, 21, 25)  Whatever its

4  unsupported and unsupportable beliefs, ACRF points to absolutely no instance, not one, in which a

5  contract under the ACDBE Program was affected by race conscious determinations. Indeed, what

6  ACRF conveniently forgets to note is that the ACDBE Program intended to meet its overall

7  diversity goals "to the maximum extent feasible through race-neutral measures." (Exh. 1, p. 8, ¶

8  B to Complaint.) Thus, as fully discussed in the ACDBE Program description attached as Exhibit

9  1 to the Complaint, but which language ACRF fails to address, race conscious measures were to

10  be employed, if ever, if, and only if, race neutral measures proved inadequate. (Exh. 1, p. 14, ¶ C

11  to Complaint.) ACRF has only bald assertions that the potential for such use became a reality.

12  Moreover, the race-conscious components of the ACDBE Program has a sunset provision and is

13  set to expire in just a few weeks, on January 1, 2008. (RJN, Exh. 16.)  As such, even assuming

14  arguendo that standing were not an issue, there is little likelihood that ACRF or its members face a

15  threat of imminent harm. Moreover, any opinion the court could render on this matter will be

16  moot by the time it hears argument on the instant Motion.

17        The law is clear that a claim is "too speculative" where the proposed harm depends on the

18  occurrence of "contingent future events that may not occur as anticipated, or indeed may not occur

19  at all." See Texas v. United States, 523 U.S. 296, 300, 118 S.Ct. 1257, 1259-1260 (1998).  Here,

20  the case is not ripe for adjudication because there are no actual facts to support ACRF's claim of a

21  real controversy. For this reason as well, the court should dismiss ACRF's Complaint.

22        **4.    As a Matter of Law, ACRF is Not Entitled to Injunctive or Declaratory Relief**

23        As fully discussed, the "injury in fact" test for federal standing requires that a party who

24  seeks relief from the provisions of an allegedly unconstitutional public act must show "actual or

25  imminent," rather than "conjectural or hypothetical" harm from its application. Lujan, 504 U.S. at

26  560. Where, as here, a petitioner seeks declaratory or injunctive relief, the mere possibility of

27  potential future harm is insufficient to create standing, even when, unlike here, plaintiff has been

28  harmed in the past. Thus, a plaintiff must show "a very significant possibility of future harm in

14

1     order to have standing." Bras v. California Public Utilities Com'n, 59 F.3d 869, 873 (9th

2     Cir.1995).

3          Even assuming standing, however, to obtain injunctive relief, a moving party must

4     demonstrate either a combination of probable success on the merits and the possibility of

5     irreparable harm or that serious questions are raised and the balance of hardships tips sharply in

6     plaintiff's favor. William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 526 F.2d 86,

7     88 (9th Cir. 1975) Under either formulation of the test, the party seeking the injunction must

8     demonstrate that it will be exposed to some significant risk of irreparable injury. Caribbean

9     Marine Servs. Co. v. Baldridge, 844 F.2d 668 (9th Cir. 1988). Hence, a plaintiff must do more

10    than allege imminent harm sufficient to establish standing for equitable relief. Injunctive relief

11    requires a threat of demonstrable imminent harm and this ACRF cannot show. Los Angeles

12    Memorial Coliseum Comm'n v. National Football League, 634 F.2d 1197, 1201 (9th Cir.1980).

13    For this reason, ACRF is not entitled to the equitable relief it seeks.

14    **C.    ACRF's Facial Challenge Is Barred by the One-Year Statute of Limitations**

15         A facial challenge to a statute or ordinance accrues when it is adopted and the statute of

16    limitations for an alleged infringement of constitutional rights is one year. Coral Construction,

17    Inc. v. City and County of San Francisco, et al., 116 Cal.App.4th 6, 26-27 (2004). As plead in its

18    Complaint, ACRF apparently views the Port's adoption of a resolution approving the ACDBE

19    Program and authorizing the Port's Executive Director to submit the program to the FAA for final

20    approval as an exercise of a legislative act subject to a facial constitutional attack. Defendants

21    disagree with this characterization of the Port's action.[2] However, assuming arguendo, that ACRF

22    is correct, ACRF's facial challenge to the ACDBE Program is subject to a one year statute of

23    ————————————

24    [2] The Port's position is that the resolution adopting the 2006-2008 ACDBE Program constitutes a
      ministerial, not legislative act. "A ministerial act is an act that a public officer is required to
25    perform in a prescribed manner in obedience to the mandate of legal authority and without regard
      to his own judgment or opinion concerning such act's propriety or impropriety, when a given state
26    of facts exits." Transdyn v. City and County of San Francisco, 72 Cal.App.4th 746, 751 (1999).
      The Port's resolution was merely an act implementing a FAA contractual mandate to comply with
27    49 CFR Part 23. (RJN, Exhs. 15 & 16.)

28

MPA ISO Motion to Dismiss (FRCP 12(b)(6))
[CV 07 6058-(JCS)]

1    limitations from the date the legislation was enacted.

2    The Complaint alleges that "[o]n February 23, 2006, the Port adopted the ACDBE

3    Program." (Complaint, ¶ 10.) Taken as true, for the Complaint to be timely, ACRF would have

4    had to bring its facial challenge to the ACDBE Program within one year of this date or

5    approximately February 23, 2007. ACRF failed to do so. Even assuming that the operative date

6    for the one-year statute of limitations to run was one year from the date the FAA approved the

7    Program, or March 24, 2006, the facial challenge is still too late -- ACRF filed its Complaint on

8    July 6, 2007, well over a year later. Accordingly, Plaintiff's constitutional challenge to the

9    Complaint in its entirety is barred as a matter of law.

10   **D.    ACRF's State-Law Claim under Proposition 209 Is Preempted by Federal Law**

11   ACRF contends that Proposition 209 is applicable to the Port's ACDBE Program. But the

12   Port promulgated the ACDBE Program pursuant to the federal regulatory provisions of 49 C.F.R.

13   Part 23. As to the ACDBE Program, Proposition 209 is preempted by those federal regulations.

14   The supremacy clause of the United States Constitution (art. VI, cl. 2) grants Congress the power

15   to preempt state law. See Crosby v. National Foreign Trade Council, 530 U.S. 363, 372 (2000).

16   While Defendants believe that ACRF's claim is preempted under field- *and* conflict-

17   preemption analysis, Defendants here focus on conflict-preemption. "[W]here Congress has not

18   entirely displaced State regulation in a specific area, State law will still be preempted to the extent

19   that it actually conflicts with federal law." Id. Thus, "[C]onflict pre-emption ... turns on the

20   identification of [an] actual conflict." Geier v. Am. Honda Motor Co., Inc., 529 U.S. 861, 884

21   (2000) (internal quotations and citation omitted). There are two reasons courts will find a State law

22   conflict-preempted. First, a State law will be conflict-preempted where it is "impossible for a

23   private party to comply with both state and federal requirements." English v. Gen. Elec. Co., 496

24   U.S. 72, 79 (1990). Second, State law will be conflict-preempted where that law "stands as an

25   obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

26   Hines v. Davidowitz, 312 U.S. 52, 67 (1941).

27   Congressional intent is the "ultimate touchstone" of any preemption analysis, express or

28   implied. Gade v. Nat'l Solid Wastes Management Ass'n, 505 U.S. 88, 96, 98 (1992). In

16

1  determining Congressional intent to preempt, a court must "begin with the language employed by

2  Congress and the assumption that the ordinary meaning of the language accurately expresses the

3  legislative purpose," (Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383 (1992)), because

4  "[t]he first and most important step in construing a statute is the statutory language itself." Royal

5  Foods Co., Inc. v. RJR Holdings, Inc., 252 F.3d 1102, 1106 (9th Cir. 2001) (citing Chevron USA

6  v. Natural Resources Defense Council, 467 U.S. 837, 842-44 (1984)). As the Court explained in

7  Sprietsma v. Mercury Marine, 537 U.S. 51(2002), the "task of statutory construction must in the

8  first instance focus on the plain wording of the clause, which necessarily contains the best

9  evidence of Congress' pre-emptive intent." Sprietsma, 537 U.S. at 62-63.

10      The Port established its ACDBE Program under the ACDBE regulations, 49 C.F.R. Part

11  23. The authority for these regulations came from 49 U.S.C. § 47107(e)(l), where Congress

12  articulated its intent: "[t]he Secretary of Transportation may approve a project grant

13  application...for an airport development project only if the Secretary of Transportation receives

14  written assurances, satisfactory to the Secretary, that the airport owner or operator will take

15  necessary action to ensure, to the maximum extent practicable, that at least 10 percent of all

16  businesses at the airport selling consumer products or providing consumer services to the public

17  are small business concerns (as defined by regulations of the Secretary) owned and controlled by a

18  socially and economically disadvantaged individual (as defined in Section 47113(a) of this

19  title)...." In addition, Congress also imposed DBE obligations by statute, 49 U.S.C. §47113.

20      Part 23, § 23.77(a) explains that a federal grant recipient, as a condition of remaining

21  eligible to receive federal monies, must follow the provisions of Part 23 and, to the extent any

22  State law, regulation or policy relating to ACDBE programs conflicts with Part 23, those State

23  laws, regulations or policies are preempted by Part 23:

24                  (a) In the event that a State or local law, regulation, or policy
*differs from the requirements of this part, the recipient must, as a*

25  *condition of remaining eligible to receive Federal financial assistance*
*from the DOT, take such steps as may be necessary to comply with the*

26  *requirements of this part.*
...

27

28

1            (e) However, nothing in this part preempts any State or local law,
regulation, or policy enacted by the governing body of a recipient, or

2    the authority of any State or local government or recipient to adopt or
enforce any law, regulation, or policy *relating to ACDBEs, as long as*

3    *the law, regulation, or policy does not conflict with this part.* (Emphasis added.)

4    The Port's ACDBE Program is a direct result of Congress' intent for airports to implement, at the

5    local level, the federal affirmative action program as set forth in 49 U.S.C. § 47107(e)(l) and 49

6    C.F.R. Part 23. Section 23.25(e) of Part 23 is in direct conflict with Proposition 209 because the

7    federal regulation requires airports to use race-conscious measures where race-neutral measures

8    alone are not projected to be sufficient to meet ACDBE goals, whereas, the state law allegedly

9    prohibits the use of such race-conscious measures entirely.  Accordingly, Part 23 preempts

10   application of Proposition 209 to the Port's ACDBE Program.

11   **IV.    CONCLUSION**

12        For all of the foregoing reasons, Defendants respectfully request that the Court grant its

13   motion to dismiss the complaint on the grounds that Plaintiff fails to state an action for which

14   relief can be granted.

15   DATED: December ___, 2007    Respectfully submitted,

16                           MEYERS, NAVE, RIBACK, SILVER & WILSON

17

18                    By:    _____/s/_____

19                       Mara E. Rosales
Attorneys for Defendants CITY OF OAKLAND

20                       and PORT OF OAKLAND

21   1036392.2

22

23

24

25

26

27

28

MPA ISO Motion to Dismiss (FRCP 12(b)(6))
[CV 07 6058-(JCS)]